Raymond W. BENNETT, Jr.

v.

Eleanor R. BENNETT.

No. 79–77–Appeal.

Supreme Court of Rhode Island.

Aug. 26, 1981.

James P. Flynn, North Kingstown, for plaintiff.

Kirshenbaum & Kirshenbaum, Alfred Factor, Providence, for defendant.

## OPINION

WEISBERGER, Justice.

This is an appeal from a decision of a justice of the Superior Court granting a new trial following a jury verdict in an action to set aside a conveyance of real estate on grounds of coercion and duress. A jury in the county of Washington found in favor of Raymond W. Bennett, Jr. (Raymond), determining that the conveyance resulted from duress brought to bear by his former wife, Eleanor R. Bennett (Eleanor).[1] Subsequently the trial justice granted the motion for a new trial on the ground that the verdict

> "entered by the jury is wrong because it fails to respond to the merits of the controversy and to administer substantial justice and is against the fair preponderance, or in this case, the clear and convincing evidence which was the Plaintiff's burden of proof in this case * * *."

Raymond contends that the trial justice failed to carry out his function in passing upon a motion for a new trial as enunciated in *Barbato v. Epstein*, 97 R.I. 191, 196 A.2d 836 (1964), in that the trial justice overlooked and misconceived material evidence and was clearly wrong. We disagree. The pertinent facts are as follows.

Raymond and Eleanor began to experience serious marital difficulties during the latter half of 1974. The discord was predicated upon, and aggravated by, the family's recurrent financial crises of approximately five years' duration. A total of twelve liens had been recorded on the real estate that is the subject of this litigation. Raymond conceded that the financial difficulties had resulted from his gambling and apparently also from two unsuccessful business ventures.

Sometime in late 1975 (the exact dates are subject to dispute), Eleanor consulted an attorney. She filed a petition for absolute divorce and requested exclusive use of the marital domicile, custody of the parties' two minor children, together with child support and alimony in the aggregate amount of $125 per week. Raymond, who did not obtain the assistance of an attorney, met with Eleanor and her counsel to discuss the terms of the divorce. The parties discussed the question of title to the real estate, and upon Eleanor's request, Raymond indicated orally that he would transfer his interest in this property to her.

Eleanor's attorney prepared an interlocutory decree setting forth terms regarding child custody, visitation, use of the marital home, and the support provisions upon which agreement had previously been reached. Also the attorney prepared a deed to effectuate the transfer of Raymond's interest in the real estate to Eleanor. He signed an assent to the interlocutory decree; however he declined to execute the deed. The decree that was entered December 16, 1975 provided for weekly support payments in the sum of $125 to Eleanor, of which $75 was allocated to alimony and $50 was allocated to child support.

Subsequently, on January 9, 1976, Raymond executed a deed that transferred his interest in the marital home to Eleanor. A second interlocutory consent decree was entered by the Family Court on March 23, 1976, which decree provided for a reduction of the weekly alimony payment from $75 to $25. Approximately eight months later Raymond brought this action, alleging that the deed was executed under "duress, coercion, and threats of prosecution" and praying that it be declared invalid. In support of this contention, Raymond testified that after leaving his wife, acute financial distress caused him to seek a loan of $500 from

1. The parties have neither briefed nor argued the effect of this verdict. We do not, therefore, address the issue of whether it was binding upon the trial justice or advisory in light of the equitable relief prayed for in the complaint.

*See Maryland Casualty Co. v. Sasso*, 98 R.I. 483, 204 A.2d 821 (1964); 8 Wright & Miller, *Federal Practice and Procedure*: Civil § 2335 at 124–28 (1971).

Associate Financial Services (Associate) in December 1975. In order to obtain this loan, he arranged for a woman posing as his wife to co-sign the note. When Eleanor learned of this deception, he asserted, she went to Associate and to the police to inform them both of what had occurred. He further testified that Eleanor called him at work, disclosed that she had told the police and the finance company that her husband had wrongfully procured the co-signature on the note, and further requested that Raymond stop at the house after work. Raymond testified that Eleanor threatened him at this meeting saying,

"If you don't give me the house, * * * [y]ou and your friend are going to be in serious trouble. * * * Your friend more than you. [sic]"

Raymond stated that he then "panicked" and went alone to the office of Eleanor's attorney and signed the deed that was presented to him by the receptionist.

Eleanor's testimony concerning the discussion of the Associate loan differed substantially from Raymond's. Eleanor testified that she:

"told [Raymond] that he was in trouble and that it was a real mess, and that if he continued to do things like that we're just going to end up losing everything anyways. So, I told him, 'If you will sign the deed, give me the house, I'll reduce the alimony down to $25 a week; I will forget about the $200 [he was in default on support payments]. I will pay all the liens and be responsible for the property.' He said, 'Okay,' and I also said, 'You have to take care of your Finance Company note, that whoever forged it [sic], you're responsible for that, I'm not.' And, he said, 'Okay,' * * *."

At the conclusion of the presentation of evidence, the jury was instructed as to the law relating to duress in the following terms:

"Duress exists when one, by the unlawful act of another, is induced to perform some act under circumstances which would deprive him of the exercise of free will. * * * [A]nd another way of defining duress is: duress is that degree of constraint or danger either actually inflicted or threatened and impending which is sufficient in severity or in apprehension to overcome the mind and will of a person with ordinary firmness."

No objection was taken to this portion of the charge, and it therefore became the law of the case. *Carraturo v. Lawrence,* 107 R.I. 463, 268 A.2d 277 (1970).

The jury commenced its deliberations, received supplemental instructions, and finally rendered a verdict in favor of plaintiff on the following day.

In passing upon the motion for new trial, the trial justice accepted the testimony of Eleanor and her attorney as credible. He found that the reduction of alimony payments and the abandonment of a motion to adjudge in contempt for arrearages of such payments constituted the *quid pro quo* for the signing of the deed. He did not find Raymond's testimony to be credible and determined in the light of his charge that plaintiff failed by far to meet the burden of proving duress by clear and convincing evidence. We stated in *Gordon v. Campanella Corp.,* 112 R.I. 417, 311 A.2d 844 (1973), rather exact directions to be followed by a trial justice in considering a motion for new trial under the doctrine of *Barbarto v. Epstein, supra*:

"A studied consideration of that case makes it quite clear that in this jurisdiction a trial justice, when acting on * * * a motion, might be classified as 'a [seventh] juror' because he brings into play his more experienced judgment by independently reviewing all of the material evidence in the light of his charge to the jury, passing upon the weight thereof, and assessing the credibility of the witnesses who have appeared before him. * * [H]e may also draw inferences which are reasonable in view of other testimony and the evidence which are in the record.

"Once the trial justice has scrutinized the evidence in the fashion described here, he must make one of two choices. In those instances where his judgment tells him that the particular evidence and

the reasonable inferences to be drawn therefrom are so nearly balanced that reasonable men could arrive at different results in the consideration of the case, he is obliged to deny the motion and affirm the verdict. However, if his judgment tells him that the jury's verdict is against the fair preponderance of the evidence and thereby fails either to do justice to the parties or to respond to the merits of the controversy, the motion must be granted and the verdict set aside." *Gordon v. Campanella Corp.*, 112 R.I. at 420–21, 311 A.2d at 847.

■ In the case at bar the trial justice performed his duty in strict conformity to the foregoing standard. He considered in detail the testimony of the major protagonists, determined credibility, and drew inferences from the testimony that he found to be credible. He concluded that the verdict was against the weight of the evidence and that it failed both to respond to the merits of the controversy and to administer substantial justice between the parties.

Since the trial justice performed his function as the law requires, it is Raymond's task to persuade this court that the trial justice was obviously mistaken in his judgment or overlooked or misconceived evidence on a controlling issue in the case. *Id.* at 421, 311 A.2d at 847; *Roberts v. Wills*, 108 R.I. 586, 277 A.2d 754 (1971).

■ In implementation of this burden of persuasion, Raymond has fired off a virtual broadside of critical analyses of the trial justice's decision. However, a careful examination of the transcript discloses that the evidence purported to be overlooked was in all instances merely cumulative, corroborative, or related to undisputed facts not controlling on the central issue presented. In sum, we are not persuaded that the trial justice was clearly wrong or that he overlooked any material evidence on a controlling issue in the case.

■ Raymond further contends that the trial justice substituted his judgment for that of the jury. As we have previously said, "every time a new trial is granted on the ground that the verdict is contrary to the evidence, there is indeed a substitution of the trial justice's conclusion for the finding of the jury." *Gordon v. Campanella Corp.*, 112 R.I. at 421, 311 A.2d at 847. Obviously, a trial justice cannot make an independent evaluation without substituting his judgment for that of the jury to some extent. The vital question, however, is whether that substitution of judgment is in accordance with the standards laid down in our cases. In the instant action the justice exercised his independent judgment with impeccable fidelity to the requirements of our precedents.

Raymond adds further arguments, including an attack upon the standards set forth in *Barbato v. Epstein, supra.* Suffice it to say that we consider those arguments to be wholly without merit and that we are unwilling to recede from the sound principles expounded in *Barbato* and reaffirmed in an unbroken line of cases down to the present time. *See, e. g., Yammerino v. Cranston Tennis Club, Inc.*, R.I., 416 A.2d 698 (1980); *Galusha v. Carlson*, R.I., 386 A.2d 634 (1978); *Ruggieri v. The Big G Supermarkets, Inc.*, 114 R.I. 211, 330 A.2d 810 (1975); *Gordon v. Campanella Corp., supra.*

For the reasons heretofore stated, the appeal of the plaintiff is denied and dismissed, the decision of the Superior Court granting the motion for a new trial is affirmed, and the case is remanded to the Superior Court for further proceedings.

SHEA, J., did not participate.